Receipt # 062697

ORIGINAL

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR 11 2005
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| Government Telecommunications, Inc.<br>4500 Southgate Place, Suite 300<br>Chantilly, Virginia 20151,<br><br>Plaintiff,<br><br>v.<br><br>The United States,<br><br>Defendant. | No. 05- 463C |

## COMPLAINT

COMES NOW the Plaintiff, Government Telecommunications, Inc. (GTI), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Postal Service (USPS or Postal Service), and states as follows:

## JURISDICTION

1. This court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. GTI brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, GTI brings this action directly to the United States Court of Federal Claims within 12 months of the imputed "deemed denied" date of the Contracting Officer's Final Decision.

## PARTIES

3. The Plaintiff, GTI, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Chantilly, Virginia. Among

other things, GTI contracts with various United States governmental agencies, including the Postal Service, for the design and installation of electrical and telecommunication equipment infrastructure. One of GTI's specialties is the performance of such installation on multiple, geographically diverse, locations. GTI is a wholly owned subsidiary of Computer Equity Corporation. Computer Equity Corporation is a wholly owned subsidiary of Applied Digital Solutions, Inc., headquartered in Delray Beach, Florida.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the Postal Service.

**NATURE AND SUMMARY OF ACTION**

5. This action is brought by GTI pursuant to the provisions of the CDA, 41 U.S.C. § 609 seeking recovery against the government for the additional costs incurred by GTI for processing security clearances and for performing site surveys under Contract 3AAERD-03-P-6080 (the Contract) with the Postal Service. GTI is entitled to recover these additional costs under a number of legal theories, including the constructive change doctrine. The amounts claimed by GTI are $101,557 for the additional cost of processing security clearances and $266,315 for the additional cost of performing site surveys. The total amount claimed by GTI in this action is $367,872, plus interest allowed as under the CDA.

**STATEMENT OF FACTS**

*Contract Award and Overview*

6. On April 7, 2003 the USPS issued RFP 3AAERD-03-A-1200, accompanied by a statement of work (SOW) defining the requirements for upgrading the existing baseband local area network wiring at up to 62 mail processing plants (sites) and 12 co-located administrative networks to meet current wiring standards for "USPS structured wiring." These initial 62 sites

came to be known as the "Phase I" sites. The additional 88 sites added via Amendment 2 to the solicitation on April 24, 2003 came to be known as the "Phase II" sites. The procurement was conducted under USPS competitive procedures, terms, and conditions. Eight contractors were solicited.

7. According to the SOW, the scope of work for this program, termed the Mail Processing Infrastructure or MPI program by USPS, included pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation.

8. Proposals were initially submitted on May 5, 2003. On May 15, 2003, the Postal Service held a vendor conference, the purpose of which was to ensure a common understanding of the work inherent in each Contract Line Item Number (CLIN) by providing a detailed oral description of the CLIN requirements. The offerors then submitted revised pricing on May 20, 2003.

9. On June 4, 2003, GTI was notified by the Postal Service that it was one of the finalists for award. USPS invited GTI to a meeting on June 6, 2003 for further negotiations on GTI's offer; and later on June 6th, GTI submitted its final price proposal. On June 20, 2003, the Postal Service notified all bidders that Contract award had been made to GTI.

10. GTI encountered a number of instances during the course of Phase I performance for which it is entitled to an upward adjustment in Contract price. Two of these categories for which GTI is entitled to recover are the additional costs for processing security clearances and for performing site surveys, as discussed more fully below.

*Factual Background – Security Clearances*

11. The SOW provides as follows concerning security clearance requirements:

> Basic clearances are required for those individuals who will require access to postal facilities only, while sensitive clearances

> are required for those who will have access to sensitive postal information and resources. It is anticipated that contractor personnel for the MPI project will only require acquisition of a Basic Clearance.

Contract, General Requirements, Art. A.3.

12. The SOW thus contemplates two security clearance levels: a "basic" security clearance for contractor personnel and a "sensitive" security clearance for a select and limited number of contractor management personnel. The SOW further defines as "basic" security clearance as comprising five elements. These five elements include: (i) passing a drug screening test for a selected list of abused substances; (ii) not being on parole, probation, or suspended sentence for the commission of a felony; (iii) no conviction within the previous five years for offenses involving dishonesty, moral turpitude, financial gain, or assault; (iv) not having been engaged in the illegal use, possession, sale, or transfer of narcotics or other illicit drugs during the previous five years; and (v) not having pending serious criminal charges such as murder, rape, robbery, burglary, physical assaults, sale and distribution of drugs, or weapons violations. Section 272 of the USPS Administrative Support Manual (ASM) 13, which is incorporated by reference into the Contract, defines a "basic" security clearance as embracing the same five elements.

13. The SOW also identifies the ten criteria that an individual must satisfy to be eligible to obtain a "sensitive" security clearance. These ten elements include: (i) passing a broad-based criminal background check; (ii) presenting an acceptable credit history; (iii) presenting an acceptable employment history; (iv) verification of United States citizenship; (v) passing a drug screening test for a selected list of abused substances; (vi) completion of an authorization and release form; (vii) completion of a Sensitive Security Clearance Processing Request; (viii) completion of a computer access form (as applicable); (ix) completion of a

Questionnaire for Public Trust Position; and (x) taking two sets of fingerprints. Section 272 of the ASM, while making reference to "sensitive" security clearances, does not set out the criteria necessary to achieve that status.

14. Initially, GTI planned to satisfy the security clearance requirements by processing the vast majority of its employees and its subcontractors' employees under the five-part "basic" clearance requirements, just as the SOW required (please see ¶ 12 above for a listing of the five elements). GTI planned to absorb this security clearance function within its existing managerial and administrative ranks.

15. However, following Contract award, the USPS changed the SOW's clear mandate that the vast majority of the workers be cleared only to the "basic" level. In these directives, which were provided both orally and via e-mail by authorized USPS representatives at various times, including early September 2003, the USPS now required that the majority of contractor personnel be cleared to the "sensitive" level.

16. Further complicating the security clearance process was USPS' insistence that for those "basic" security clearances that did remain, GTI utilize pre-printed Government forms that included a more extensive set of requirements than those imposed by the SOW. These forms included requirements that extended significantly beyond the SOW-specified "basic" requirements. These forms, termed "enhanced basic," now required that the applicant successfully comply with the following elements: (i) five-year criminal check in counties where the applicant lived and worked; (ii) five-panel drug screen; (iii) issuance of a 5140 badge; (iv) two passport-sized photographs; (v) completion of a Fair Credit Act reporting form; (vi) copy of a passport or birth certificate; and (vii) completion of Form 2181C.

17. Likewise, the pre-printed Government form for a "sensitive" security clearance was more comprehensive and extensive than its "sensitive" counterpart included in the SOW. These forms, termed "enhanced sensitive," now required that the applicant successfully comply with the following elements: (i) completion of the SF 85P Questionnaire (nine pages); (ii) seven-year criminal check in counties where the applicant lived and worked; (iii) seven-year employment verification; (iv) completion of a Fair Credit Act reporting form; (v) completion of Form 1357 (computer access); (vi) completion of Form 2013 (interim clearance); (vii) completion of Form 2181C (release form); (viii) credit check; (ix) two fingerprint cards; (x) five-panel drug screen; (xi) 5140 badge; (xii) two passport-sized photographs; and (xiii) copy of a passport or birth certificate.

18. On November 10, 2003, the USPS presented GTI with a new set of security ground rules, which included the following security-related changes: (i) local security clearance for an individual assigned to only one USPS facility for two weeks or less; (ii) "non-sensitive" clearance for an individual assigned to only one USPS facility for more than two weeks; and (iii) "sensitive" clearance for an individual assigned to multiple USPS facilities. The "non-sensitive" clearance category, while identified in the USPS ASM 13, Section 272, was not identified in the SOW as a potential security category. While the criteria for a "non-sensitive" clearance are not as comprehensive as those for a "sensitive" clearance, the administrative processing time for these two security categories is comparable. As can be seen, the requirements of processing a "non-sensitive" clearance are considerable, as this new level of clearance required that the applicant comply with the following elements: (i) completion of the 2025 Questionnaire (two pages); (ii) five-year criminal background check where the applicant lived and worked; (iii) five-year employment verification; (iv) credit check; (v) five-panel drug screen; (vi) completion of

Form 2181C (release form); (vii) completion of a Fair Credit Act reporting form; (viii) issuance of a 5140 badge; (ix) copy of passport or birth certificate; (x) two passport-sized photographs; and (xi) two fingerprint cards.

19. On January 9, 2004, the USPS again changed the security ground rules, this time requiring that installers obtain "non-sensitive" clearances and that on-site project managers obtain "sensitive" clearances.

20. On October 4, 2004, GTI submitted to the Postal Service a Request for Equitable Adjustment (REA) seeking an amount of $101,557 associated with the additional costs of processing security clearances. Despite GTI's multiple invitations to meet and discuss the security clearance REA, USPS failed and refused either to meet or discuss the matter.

21. Having reached a constructive impasse in the security clearance REA contract administration process, GTI on February 2, 2005 re-filed the REA as a certified claim under the CDA and formally requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the security clearance issues is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

*Factual Background – Site Surveys*

22. The SOW contemplated that prior to providing pricing for each of the sites subject to the MPI program, the contractor would perform individual site surveys consistent with the requirements prescribed in Section A.6 of the Contract General Requirements. Section A.6, in turn, provides in part:

> A site survey shall be jointly conducted by the contractor and USPS for each of the 62 sites. The individual cost proposals shall

> be based on the contractor's unit costs proposed and awarded in Section A. The Postal Service reserves the right to forego accompanying the contractor during some or all site surveys.

23. Additionally, among other things, Section A.6 required for each site that the contractor identify certain key locations on USPS-provided Operational Site Layouts (OSL's) and provide the Postal Service with a distribution design consisting of updated OSL's. While this Contract provision addressed the discrete tasks that had to be performed during a site survey, it did not prescribe any expected or required durations for the performance of this work.

24. In preparing its bid estimate for the work, GTI reasonably assumed that the site survey requirements for the Contract would be similar, if not identical, to survey requirements in a series of earlier Wire and Cable Services (WACS) task orders performed by GTI. Those earlier task orders required that GTI perform MPI-like work on a number of USPS sites that were virtually identical on a per-site basis to the work scope for the Contract.

25. For that earlier MPI-like work, a USPS engineering representative and an end-user representative accompanied GTI in conducting the site surveys. Also during the performance of the WACS task order work, GTI interpreted the contract to require that the planned MPI changes be depicted as no more than hand-drawn markups of existing OSL drawings. For each of the WACS task order sites, GTI submitted for approval the proposed MPI changes depicted as hand-drawn markups to the OSL's, and USPS approved them as presented.

26. The pricing sheets for the Contract here did not provide a separate CLIN for site surveys. Rather, this work was distributed and allocated over the unit pricing associated with the installation work activities.

27. Once performance under the Contract was underway, however, USPS fundamentally changed the survey work and initial design requirements. Here, USPS

representatives did not accompany GTI engineers during the conduct of the site surveys for the Phase I and Phase II sites covered by the Contract work scope. Instead, USPS delegated that function to Northrup Grumman consultants working as part of what is referred to as the "Raleigh Engineer Group."

28. Upon information and belief, the Northrup Grumman consultants assigned to the Raleigh Engineer Group (hereinafter referred to as "USPS engineering consultants") were not familiar with USPS' practice with regard to the required scope of the site surveys as established by both the course of dealing of the parties on this issue and a plain reading of the SOW. Instead of allowing GTI to conduct the site surveys and prepare the initial design in an efficient and cost-effective manner, as was done in the earlier Wire and Cable contract, USPS, acting though its engineering consultants, required GTI to perform a number of additional tasks that were not required by the SOW.

29. For the Contract site survey work, instead of letting the scope of the site survey requirements dictate the duration of the site survey activities, as was done during the performance of the earlier WACS task orders, USPS, working through its engineering consultants, and without any support from the Contract, past practice, or any code, standard, or guidance document, mandated that site surveys were to be conducted according to the following schedule (which includes two days for travel (1) to the site and (2) return home):

"small" sites – three days
"medium" sites – four days
"large" sites – five days

30. Thus, the required time on-site for the site survey itself became: "small" sites – one day; "medium" sites – two days; and "large" sites – three days. USPS further required that the morning of the first day on-site be set aside for a presentation delivered by the USPS

engineering consultant, with GTI participation, to the USPS end-user as to the MPI changes expected to be implemented at the site. This formal "kickoff" presentation was nowhere set out in the Contract nor was it required during the earlier WACS task order work.

31. Also during performance of the site survey work, USPS required GTI to conduct a post-survey walk-down with the end-user to review the features of the MPI design as generated by the site survey. This requirement was nowhere to be found in the Contract. Indeed, GTI had been led to believe, based on performance of the earlier WACS task orders, that the end-user would accompany GTI during the conduct of the site survey itself.

32. Also, at the conclusion of the survey work at each site, USPS required GTI to develop three sets of hand-annotated OSL's and to sign-off as to the accuracy of these documents. These additional tasks were neither required by the Contract nor experienced during performance of MPI work under the earlier task order work.

33. The USPS engineering consultants displayed a wide variation in training, skill, and consistency, depending on which individual was assigned to a particular site. This unevenness further exacerbated the delays experienced during the conduct of the site surveys.

34. Another departure from past practice was USPS' insistence that GTI depict the as-planned MPI designs in CAD-formatted layout. While the Contract required that the final as-built designs be depicted in a CAD format, USPS' insistence that the *as-planned* designs also be so depicted forced GTI hire a dedicated CAD operator earlier in the program than it otherwise would have and forced GTI to make numerous duplicative and trivial changes to the CAD-formatted designs.

35. Changes to the CAD-formatted designs were necessitated both (i) in order to conform to multiple changes made by USPS to SOW Attachment B-3 ("Zone Box Port

Requirements"), and (ii) to suit the various whims and preferences of the individual USPS engineering consultants.

36. Because of this directive for the premature use of CAD-formatted designs, each CAD drawing had to be modified at least twice following its initial preparation. Moreover, it was necessary for GTI's engineering staff to spend time reviewing and approving each of these CAD-formatted designs and the changes and revisions thereto. These additional tasks concerning the depiction of the initial MPI designs, which were performed off-site at GTI's offices, were not required by the Contract and were not consistent with past practices between GTI and USPS.

37. Not only were the additional tasks identified above not required, they did not in any way benefit any ultimate deliverable under the Contract.

38. On October 28, 2004, GTI submitted to the Postal Service a REA seeking an amount of $266,315 associated with the additional costs of performing site surveys. Despite GTI's multiple invitations to meet and discuss the security clearance REA, USPS failed and refused either to meet or discuss the matter.

39. Having reached a constructive impasse in the site survey REA contract administration process, GTI on February 2, 2005 re-filed the REA as a certified claim under the CDA and formally requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the security clearance issues is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

## COUNT I

**Equitable Adjustment: Failure to Issue an Equitable Adjustment for Additional Cost of Processing Security Clearances under the "Changes" Clause**

40. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 39 as if fully set forth herein.

41. The Contract includes a "Changes" clause under which GTI is entitled to an equitable adjustment to the Contract price for directed or constructive changes to the Contract. *See* Contract clause 3.6.c., "Changes." Contract clause 3.6.c.(3) provides that "[i]f any such change affects the cost of performance or the delivery schedule, the contract will be modified to effect an equitable adjustment."

42. Following the award of the Contract, the USPS constructively changed the Contract, pursuant to its "Changes" clause, by escalating and reclassifying the security clearance requirements, as described above.

43. The foregoing changes caused GTI to perform additional work, and incur additional costs, in processing security clearances beyond the minimum level required by the Contract.

44. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the additional cost of processing security clearances. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment, GTI has sustained damages in the amount of $101,557.

45. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count I in the amount of $101,557, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT II

### Equitable Adjustment: Failure to Issue an Equitable Adjustment for Additional Cost of Performing Site Surveys under the "Changes" Clause

46. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 45 as if fully set forth herein.

47. The Contract includes a "Changes" clause under which GTI is entitled to an equitable adjustment to the Contract price for directed or constructive changes to the Contract. *See* Contract clause 3.6.c., "Changes." Contract clause 3.6.c.(3) provides that "[i]f any such change affects the cost of performance or the delivery schedule, the contract will be modified to effect an equitable adjustment."

48. Following the award of the Contract, the USPS constructively changed the Contract, pursuant to its "Changes" clause, by requiring GTI to perform additional site survey work, as described above.

49. The foregoing changes caused GTI to perform additional work, and incur additional costs, in performing additional site survey work beyond the minimum level required by the Contract.

50. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the cost of performing the additional site survey work. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment, GTI has sustained damages in the amount of $266,315.

51. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count II in the amount of $266,315, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT III

### Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract Under the Changes Clause for the Additional Cost of Processing Security Clearances

52. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the additional cost of processing security clearances.

54. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for the additional cost of processing security clearances.

55. As a direct and proximate result of USPS' breach of Contract, GTI has sustained damages in the amount of $101,557.

56. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count III in the amount of

$101,557, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

**COUNT IV**

**Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract Under the Changes Clause for the Additional Cost of Performing Site Surveys**

57. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

58. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the additional cost of performing site surveys.

59. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for the additional cost of performing site surveys.

60. As a direct and proximate result of USPS' breach of Contract, GTI has sustained damages in the amount of $266,315.

61. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count II, that the Court enter judgment against the Postal Service on Count IV in the amount of $266,315, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 11th day of April 2005.

Respectfully submitted,

**Government Telecommunications, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff

Of Counsel:

Michael Krawitz, Esq.
General Counsel, Applied Digital